529 N.W.2d 366 (1995)
In re Raymond David IRWIN, a/k/a Raymond E. Platt, a/k/a Raymond E. Frisbee.
No. C0-94-2082.
Court of Appeals of Minnesota.
March 21, 1995.
Review Denied May 16, 1995.
*368 Ronald L. Greenley, Nicol & Greenley, Ltd., Anoka, for appellant Irwin.
Robert M.A. Johnson, Anoka County Atty., Janice Allen Wheat, Asst. County Atty., Anoka, for respondent County.
Considered and decided by HARTEN, P.J., and PARKER and MANSUR,[*] JJ.

OPINION
MARTIN J. MANSUR, Judge.
After a hearing, the trial court committed appellant to the Minnesota Security Hospital as a psychopathic personality and as mentally ill and dangerous. Appellant then moved for a new trial, which the trial court denied. The security hospital filed a report, and a review hearing was held. After the hearing, the trial court committed appellant for an indeterminate period to the security hospital as a psychopathic personality and as mentally ill and dangerous. Raymond David Irwin appeals.

FACTS
On August 3, 1993, a petition was filed to commit appellant as a psychopathic personality. Pursuant to respondent's motion, the court amended the petition in an August 17, 1993 order to include an allegation that appellant was mentally ill and dangerous. A hearing was held.
At the time of the hearing, appellant was 52 years old. The court found that throughout his life, no matter what his age or where he was living, he was the target of many accusations, some of which resulted in arrests and criminal convictions. Appellant denied, minimized or tried to justify these incidents.
From 1956 to 1958, appellant was sent to Manteno State Hospital in Illinois because of admitted threats to kill his stepfather. Appellant also admitted that he whipped his half-sister in 1958 because she refused to wash the dishes.
In 1960, appellant was convicted of automobile theft. He explained at the commitment hearing that he only borrowed the car because he did not want to walk through a picket line. In 1965, while at Moose Lake Hospital, he was accused of writing love letters to student nurses. He admitted writing love letters to one student nurse whom he claimed to have been dating. In 1965, appellant was committed to the Minnesota Security Hospital. Also in 1965, appellant fondled his 15-year-old half-sister in bed. She testified that appellant thought it was acceptable for him to have sex with her because she was only his half-sister, rather than his full sister. Appellant admitted that he fondled her, but claimed he mistakenly thought she was his brother-in-law's sister.
In 1966, there were allegations that appellant raped his teenage niece. Appellant denied the rape and was never charged with the offense. The trial court found there was no evidence upon which it could base a finding that the rape actually occurred.
In 1967, appellant was convicted of forced sexual contact with a 17-year-old girl in Los Angeles. Contrary to the records, appellant asserted that the conviction was for contributing to the delinquency of a minor, and claimed this incident involved consensual sex with a prostitute. In 1969, also in Los Angeles, appellant was convicted of trespassing. Appellant was charged in 1972 with indecent exposure to three female juveniles in Bremerton, Washington, but these charges were dismissed.
Appellant's brother-in-law testified he saw appellant hanging a teenage girl in a barn in Wisconsin in 1973. The girl had a rope around her neck and was beginning to turn *369 blue. Appellant was 32 years old at the time. The court described this hanging incident as being "incredibly impulsive" and an obviously very dangerous prank on appellant's part.
Appellant was married in 1971. He admitted that between 1980 and 1981 he beat his children with a belt until they were black and blue. Appellant also admitted to seven to eight separate criminal sexual incidents with his stepdaughter, F.I., and also admitted that sometimes she submitted to sex with him to avoid being beaten.
F.I.'s whereabouts were unknown and she did not testify at the commitment hearings. F.I.'s cousin testified as to F.I.'s confidences to her about appellant's sexual contacts with F.I. when they were young. Based upon this testimony, the court found appellant had sexual contact with F.I. several times per week over a period of at least three years, and that on at least one occasion, he held a gun to F.I.'s head while raping her. The court described this criminal sexual activity as "particularly vicious."
Appellant pleaded guilty on November 16, 1981 to first degree criminal sexual conduct with 12-year-old F.I., for an incident which occurred on May 10, 1981. He was admitted to the Minnesota Security Hospital for court-ordered evaluation. The subsequent report indicated that appellant minimized his sexual relationship with his stepdaughter, and concluded there were no realistic prospects for psychological intervention. The report recommended returning appellant to court. On January 29, 1982, appellant was sentenced to 43 months at Stillwater. He attended the transitional sex offender treatment program at Lino Lakes for four to five months in 1983, but did not cooperate with treatment or complete the program.
Appellant was returned to prison. He met M.M., a musician who performed at the prison in 1983, and informed her that he was in prison for writing bad checks. After appellant was released from prison, he contacted her.
M.M. testified by deposition that in February 1984, appellant ripped her clothes off and violently raped her in her automobile. She said appellant choked her so hard she lost her vision, and she thought she was going to die. When she tried to escape, he slammed the car door on her foot. Appellant denied raping her, and no charges were filed, but the court found the incident occurred as M.M. related it did.
M.M. testified at the commitment hearing that on another occasion in 1984, when appellant and M.M. were visiting overnight at appellant's sister's home, appellant went to the bedroom where M.M. was sleeping, put "something cold" on her throat, and said he was going to rape her. M.M. was able to escape. The court again found that this incident occurred as M.M. testified, although no charges were filed.
On July 23, 1984, appellant engaged in sexual contact with 15-year-old T.B., fondling her breasts as she slept. State v. Irwin, 379 N.W.2d 110, 113 (Minn.App.1985), pet. for rev. denied (Minn. Jan. 23, 1986); see also Irwin v. State, 400 N.W.2d 783, 786 (Minn.App.1987), pet. for rev. denied (Minn. Mar. 25, 1987). Appellant denied this allegation.
On September 23, 1984, appellant raped 14-year-old H.T., who lived in the same apartment building as M.M. His conviction for two counts of criminal sexual conduct in the second degree, one count of burglary in the first degree, and one count of assault in the second degree and the resulting sentence were upheld on appeal. Irwin, 379 N.W.2d at 116 (affirming conviction); Irwin, 400 N.W.2d at 787 (upholding denial of petition for postconviction relief). Appellant continues to adamantly deny he committed the rape, claiming he was framed by M.M. and Anoka County authorities.
Three experts provided opinions at appellant's commitment hearing: Dr. Nancy Steele, whose testimony was admitted by deposition over appellant's objections because she moved out of state; Dr. James Gilbertson, the court-appointed examiner; and Dr. Myron Malecha, the second examiner. Based upon this evidence, the court found that appellant met the statutory criteria for commitment as a psychopathic personality. It also found that appellant exhibited a habitual course of misconduct in sexual matters and exhibited an utter lack of power *370 to control his sexual impulses. The court also found appellant should be committed as mentally ill and dangerous because he suffers from a substantial psychiatric disorder manifested by faulty perceptions. It found he has engaged in many overt acts causing serious physical harm to others, and that as a result of his mental illness, there was a substantial likelihood he would engage in acts capable of inflicting serious physical harm on other persons. The trial court committed appellant to the security hospital as a psychopathic personality and as mentally ill and dangerous.
The security hospital began administering neuroleptic medication to appellant pursuant to a May 18, 1994 Jarvis order. The medication appeared to have the effect of reducing his delusions and making him more amenable to treatment.
Appellant made a motion for a new trial or amended findings based primarily on the argument that he obtained new evidence to rebut the testimony of some of the witnesses. The trial court denied the motion in a June 13, 1994 order.
The security hospital filed a treatment report. Appellant requested that the court appoint a different second examiner of his choosing, and Dr. Sharon Satterfield was appointed. The parties agreed that Dr. Satterfield's opinion could be submitted by way of her written report. At the hearing, Dr. Gilbertson testified again, as did Dr. Michael Farnsworth, the clinical director of the security hospital. The trial court committed appellant for an indeterminate period to the Minnesota Security Hospital as a psychopathic personality and as mentally ill and dangerous.
Raymond Irwin appeals.

ISSUES
1. Did the procedures followed by the trial court protect appellant's rights?
2. Did alleged irregularities in the proceeding and evidentiary rulings by the trial court deny appellant a fair trial?
3. Was there clear and convincing evidence to commit appellant as mentally ill and dangerous to the public?
4. Was there clear and convincing evidence to commit appellant as a psychopathic personality?
5. Did the application of the psychopathic personality statute violate appellant's constitutional rights?

ANALYSIS
1. Appellant contends the procedures followed by the trial court were inadequate to safeguard his rights. Appellant first argues that there is no provision for discovery in commitment cases. We note the Rules of Civil Commitment specifically provide for discovery of medical records. Minn.R.Civ.Commitment 5. "This Rule is intended to supplement the discovery and protective order provisions contained in the Minnesota Rules of Civil Procedure for County and for District Courts." Minn.R.Civ.Commitment 5 cmt. A. Appellant's argument is without merit.
Appellant also argues that there is no provision for pretrial hearings in commitment cases. Because the rules of civil commitment do not address the subject, Minn. R.Civ.P. 16, governing pretrial conferences, would apply. See Minn.R.Civ.Commitment Introductory Statement (civil commitment rules control in the event of conflict or inconsistency with provisions of any other body of otherwise applicable rules). In fact, a hearing was held on August 10, 1993, resulting in an August 17, 1993 order, in which the trial court addressed various motions brought by the parties.
Appellant next contends that the expedited nature of the hearings did not provide him with an adequate opportunity to prepare. Minn.Stat. § 526.10, subd. 1 (1992), which governed appellant's commitment as a psychopathic personality, provided that unless otherwise specified, the procedures for commitment set out in Chapter 253B would apply.[1] Commitment proceedings are subject *371 to an expedited schedule. See Minn. Stat. § 253B.08, subd. 1 (hearing within 14 days of filing petition, but may be extended 30 days for good cause); Minn.Stat. § 253B.18, subd. 2 (review hearing within 14 days of security hospital report or 90 days from initial commitment); Minn.R.Civ.Commitment 12.01 (same). A patient may waive these requirements. See In re Buckhalton, 503 N.W.2d 148, 151 (Minn.App.1993), aff'd, 518 N.W.2d 531 (Minn.1994).
A party should have a reasonable opportunity to prepare a case, and continuances should be liberally granted. Cotroneo v. Pilney, 343 N.W.2d 645, 650 (Minn.1984). Appellant does not assert his request for a continuance was denied. Instead, the hearing was continued several times at appellant's request. Further, the hearing began on October 28 and 29, 1993, and recommenced on November 15, 1993, providing additional time. Under these facts, appellant has not shown that he had inadequate time to prepare.
Appellant also argues that he was entitled to criminal due process rights, apparently challenging the constitutionality of the civil commitment law. However, there is no showing the attorney general was notified. See Minn.R.Civ.App.P. 144 (attorney general must be notified when constitutionality of a statute is questioned); Swelbar v. Lahti, 473 N.W.2d 77, 79 (Minn.App.1991) (generally, appellate courts refuse to consider questions of constitutionality when attorney general has not been notified). In any event, we note that the supreme court has recently upheld the civil commitment law against substantive due process and equal protection claims, and we do not believe appellant can prevail on his claim. See In re Blodgett, 510 N.W.2d 910, 916-17 (Minn.), cert. denied, ___ U.S. ____, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994).
Appellant also argues that the review hearing provided by Minn.Stat. § 253B.18, subd. 2 and Minn.R.Civ.Commitment 12 does not provide meaningful safeguards. Appellant's argument appears to challenge the adequacy of the evidence, which will be addressed in a later section of this opinion.
We hold that there was no showing the procedures followed by the trial court failed to safeguard appellant's rights.
2. Appellant also contends that irregularities in the proceedings and the evidentiary rulings by the trial court denied him a fair trial. He asks this court to reverse the trial court decision and order a new trial.
As an initial matter, we note that none of these issues were addressed in appellant's motion for a new trial. Generally, evidentiary issues must be raised in a motion for a new trial to preserve the issues for review. Sauter v. Wasemiller, 389 N.W.2d 200, 202 (Minn.1986). An order denying a new trial in a commitment proceeding is appealable. See In re Jost, 449 N.W.2d 719, 721 (Minn.1990). This court has also stated:
[T]he special nature of commitment * * * proceedings, coupled with the deprivation of liberty, compels a broader scope of review encompassing review of evidentiary issues on appeal from the order or judgment on the merits.
In re Gonzalez, 456 N.W.2d 724, 727 (Minn. App.1990). Therefore, we consider the issues.
Appellant moved to represent himself below. Although the trial court denied the motion, it allowed appellant to participate in cross-examination of some witnesses.
A patient has the right to be represented by counsel. Minn.Stat. § 253B.03, subd. 9; Minn.R.Civ.Commitment 3.01. Neither the statute nor the rules gives appellant the right to represent himself. Instead, the comments to the rules state that the intention is that the patient not be permitted to waive the right to representation. Minn.R.Civ.Commitment 3, cmt. B. While the statute does not have similar preclusionary language, we follow the comments. The trial court did not abuse its discretion in denying appellant's motion to represent himself.
Appellant next argues that he had a right to be present at an August 10, 1993 motion hearing. Although he acknowledges that the transcript indicates his attorney waived his presence, he now asserts that he did not personally waive it because he did not know he had a right to be present.
*372 A patient has the right to be present at all hearings unless the court finds, from a showing made at the hearing, that the patient has been informed of the right to be present at the hearing and has freely and knowingly chosen not to attend. Minn.R.Civ.Commitment 10.01. The record presented to this court shows appellant waived the right to be present, and this court cannot make findings to the contrary.
Appellant objects to the fact that he did not attend the depositions of Dr. Steele and victim M.M. There is no specific requirement that a patient be present during testimony by deposition. Further, appellant's counsel was present when the depositions were taken, and fully presented his objections. See Minn.R.Civ.P. 32.01 (deposition may be used in certain circumstances against party who was present, represented or had reasonable notice of deposition).
As to Dr. Steele's deposition, respondent notes that appellant's attorney indicated at the time of the deposition that appellant informed him he wished to be present to represent himself and be present at the deposition. Respondent contends that Dr. Steele was moving out of the state shortly, and it would have been impractical to reschedule the deposition and arrange his transport. Further, appellant's attorney conducted an extensive cross-examination and there is no evidence to suggest he was not properly represented. As to M.M.'s deposition, we note that appellant also called her to testify at the commitment hearing. While appellant and his attorney were in a separate room from M.M. during the examination, his attorney questioned her extensively.
Appellant also objects to the trial court's decision to admit into evidence the depositions of Dr. Steele and M.M. Rulings on the admissibility of evidence will not be disturbed unless an abuse of discretion or an error of law occurs. Uselman v. Uselman, 464 N.W.2d 130, 138 (Minn.1990). Because the commitment rules do not address the admissibility of depositions, we apply the rules of civil procedure. See Minn.R.Civ.Commitment Introductory Statement.
As to the use of Dr. Steele's deposition, Minn.R.Civ.P. 32.01(c)(2) provides:
The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: * * * that the witness * * * is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition.
Id. The trial court found that Dr. Steele would be out of the state at the time of the trial, and that respondent did not procure her absence. The trial court properly admitted the use of the deposition at trial, and did not abuse its discretion.
As to M.M.'s deposition, Minn. R.Civ.P. 32.01(c)(5) provides that the deposition of a witness may be used by any party for any purpose when the court finds
upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of [a] witness orally in open court, to allow the deposition to be used.
Id. The court found that such exceptional circumstances existed based upon M.M.'s fear of testifying in appellant's presence, which was buttressed by appellant's history. The decision to admit M.M.'s deposition into evidence was not an abuse of discretion.
Appellant argues that the trial court violated his right to confrontation by taking testimony from two victims, M.M. and H.T., outside the presence of appellant and his attorney. Although the trial court judge and the attorney for respondent were in the same room as the witnesses, appellant and his attorney were in a separate room and were allowed to hear the testimony only through a speaker. Appellant was not allowed to ask questions personally of these witnesses except through his attorney. Appellant notes that these witnesses previously testified in his presence at the time of the sexual assault trial against H.T., nearly ten years earlier. See Irwin, 379 N.W.2d at 112-13.
The testimony of witnesses shall be taken orally in open court unless otherwise provided by the rules. Minn.R.Civ.P. 43.01; In re *373 Bieganowski, 520 N.W.2d 525, 528 (Minn. App.1994), pet. for rev. denied (Minn. Oct. 27, 1994). This court expressed the importance of the trier of fact observing the witness, noting that:
With telephone testimony, the trier of fact can perceive some of the indicia of credibility, such as tone of voice, but cannot perceive others, such as body language. With in court testimony, the trier of fact can perceive both visual and aural indicia of credibility.
Bieganowski, 520 N.W.2d at 528; see also In re Martin, 458 N.W.2d 700, 703-04 (Minn. App.1990) (abuse of discretion to admit records based upon foundation provided by witness who testified by telephone).
In contrast, the testimony by the witnesses here was in the presence of the trial court; it was appellant and his attorney who were separated. Therefore, the trier of fact was able to observe indicia of credibility, and the concerns expressed in Bieganowski are not present.
The confrontation clauses of the federal and state constitutions explicitly apply to criminal proceedings. U.S. Const. amend. VI; Minn. Const. art. I, § 6; Sieber v. Sieber, 258 N.W.2d 754, 756 (Minn.1977) (post-dissolution matter). Psychopathic personality commitment proceedings are not criminal. In re Martenies, 350 N.W.2d 470, 473 (Minn. App.1984) (commitment as a psychopathic personality), pet. for rev. denied (Minn. Sept. 12, 1984). Therefore, the confrontation clauses are not applicable to civil commitment proceedings.
The petition for commitment as a psychopathic personality was filed on August 3, 1993. On August 10, respondent moved to amend the petition to include a request to commit appellant as mentally ill and dangerous to the public, and filed an examiner's statement by Dr. Steele in support of the motion. In its August 17, 1994 order, the court found appellant did not object to the amendment, and granted the motion. Appellant contends that it was improper to allow the amendment because he was not personally present at the hearing, and argues that the proper procedures for filing a commitment as mentally ill and dangerous were not followed. Where appellant did not oppose the amendment, he waived objection on appeal. Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 68 n. 2 (Minn.1979). In any event, the motion to amend was timely. Minn.R.Civ.P. 15.01.
Prior to the start of trial, appellant moved to suspend the state court commitment proceeding because he had filed a lawsuit in federal district court, concerning the removal of his commitment proceeding from state court. The trial court denied this motion, finding no clear direction from the federal district court that the commitment proceeding should be removed or otherwise suspended. Appellant has not asserted any facts or law which would require this court to hold that the trial court should have suspended all actions.
Appellant contends that the admission of various police reports and assorted corrections records was an abuse of the business records exception to the hearsay rule. See Minn.R.Evid. 803(6). Appellant does not cite any authority for his argument or specifically identify the exhibits to which he objects. Because appellant has not adequately argued or briefed these issues, they are deemed waived. Balder v. Haley, 399 N.W.2d 77, 80 (Minn.1987).
Appellant also challenges the trial court's decision to allow F.I.'s cousin to testify as to statements made by appellant's stepdaughter, F.I., whose whereabouts were unknown. The court admitted this testimony under Minn.R.Evid. 804(b)(5). The court also cited the comments to the rule, which indicate that the unavailability of the declarant increases the necessity for resorting to hearsay statements. Id., cmt. subd. (b)(5). The court found that the circumstances of the contacts, in which the two young girls were confiding in each other, provided adequate guarantees of trustworthiness.
While appellant himself testified that he had criminal sexual contact with F.I. on seven or eight occasions and that sometimes the 12-year-old would submit to sex to avoid being beaten, he challenges the use of the cousin's testimony. Based upon her testimony, *374 the court found appellant had sexual contact with F.I. several times per week over at least three years, and on at least one occasion held a gun to F.I.'s head while raping her. Appellant argues there was an insufficient effort to search for F.I. and that this hearsay was crucial to respondent's case and should not have been used because it was unreliable.
The investigator was unable to locate F.I., and neither appellant nor F.I.'s cousin knew her present whereabouts. Respondent gave appellant adequate advance notice of its intent to use the cousin's testimony. Further, while the cousin testified as to F.I.'s comments concerning the abuse, we note that some of the cousin's testimony concerned her own observations, including the gun which F.I. showed her and the bruises which she observed on F.I.'s body. Further, appellant himself admitted that he had abused F.I. seven or eight times, and was convicted of an act of criminal sexual conduct, all of which corroborated the hearsay. The trial court did not abuse its discretion in admitting this testimony.
Appellant also objects to hearsay testimony concerning his alleged assault on another victim. However, the court did not admit this testimony, ruling there was insufficient foundation. Thus, appellant has no cause for objection.
3. Appellant's argument that there was not clear and convincing evidence to support his commitment as mentally ill and dangerous appears to be limited to the contention that there was a lack of recent dangerous conduct.
A determination that a person is mentally ill and dangerous requires clear and convincing evidence that the patient is
a person (a) who is mentally ill; and (b) who as a result of that mental illness presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another.
Minn.Stat. § 253B.02, subd. 17; see Minn. Stat. § 253B.18, subd. 1.
The trial court noted that the only concern of the expert witnesses regarding whether or not appellant is mentally ill and dangerous was the lack of a recent attempt or threat of harm. The remoteness of an overt act does not necessarily preclude commitment as mentally ill and dangerous. In re Hofmaster, 434 N.W.2d 279, 281-82 (Minn. App.1989). This is because "good behavior in the artificial environment" of, in this case, a prison, "is not conclusive on the question of dangerousness to the public, when experts testify the proposed patient remains mentally ill and dangerous." Id. at 281. Such testimony was presented here, and clear and convincing evidence supported the commitment. Appellant does not challenge any other findings related to his commitment as mentally ill and dangerous. We therefore uphold appellant's initial and indeterminate commitments as mentally ill and dangerous.
4. Appellant also challenges his commitment as a psychopathic personality. A psychopathic personality is defined as:
[T]he existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with respect to sexual matters and thereby dangerous to other persons.
Minn.Stat. § 526.09 (1992). The supreme court has construed the statutory definition to include only those who, by a habitual course of misconduct in sexual matters, "have evidenced an utter lack of power to control their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of their uncontrolled and uncontrollable desire." State, ex rel. Pearson v. Probate Ct., 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), aff'd, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).
The supreme court has further defined this as "an identifiable and documentable *375 violent sexually deviant condition or disorder." Blodgett, 510 N.W.2d at 915 (footnote omitted). In applying the test, the court will consider the nature and frequency of the sexual assaults, degree of violence, relationship between the offender and the victims, offender's attitude, mood, medical history and testing results, and other facts which weigh on the predatory sexual impulse and lack of power to control it. Id. When utter uncontrollability of sexual impulses is found, and when there is a large gap of time between the petition for commitment and the person's last act of sexual misconduct, the trial court should consider certain factors in predicting serious danger to the public. In re Linehan, 518 N.W.2d 609, 614 (Minn. 1994). These factors include demographic characteristics, history of violent behavior, base rate statistics, sources of stress in the environment, similarity of present or future context to the context in which the person has used violence in the past, and the person's record with regard to sex therapy programs. Id.
The trial court must have clear and convincing evidence to support its findings. In re Rodriguez, 506 N.W.2d 660, 662 (Minn. App.1993), pet. for rev. denied (Minn. Nov. 30, 1993). On appeal, findings of fact will not be reversed unless clearly erroneous, but the appellate court need not defer to the trial court on issues of law. Id.
The trial court made extensive findings to support its determination that the statutory factors were met. Minn.Stat. § 526.09. Appellant does not challenge these findings on appeal. The trial court also found that appellant had engaged in a habitual course of sexual misconduct, which appellant also does not challenge on appeal. See Linehan, 518 N.W.2d at 613 (criminal history demonstrated habitual course of sexual misconduct element of Pearson test met).
The trial court found, based upon the testimony by experts, that appellant lacks utter control of his sexual impulses under Pearson and Blodgett. Appellant challenges this determination, contending that the experts expressed difficulty with the lack of control issue and were troubled by his lack of recent dangerous behavior. He also cites testimony from Dr. Gilbertson that he was not treatable, and testimony from Dr. Malecha that he could obtain treatment outside the hospital in support of his argument that commitment was not warranted.
The trial court found that all three experts concluded appellant exhibited an utter lack of power to control his sexual impulses. Dr. Malecha testified that if utter lack of control means that under certain circumstances one reaches a point where there is an utter lack of power to control impulses (as opposed to having an utter lack of control every minute of the day), then appellant evidenced such an utter lack of control. Dr. Steele noted that appellant is strongly compelled to act out. For example, when appellant could not reach his intended victim, M.M., he transferred his aggression to the next closest and vulnerably available female, H.T. In addition, appellant himself implied the same thing happened with the rape of his stepdaughter; he was no longer sleeping with his wife and so he reached out to F.I. Dr. Steele testified it was very likely appellant would sexually assault others if released. Dr. Gilbertson testified that an important factor in determining whether one has power to control sexual impulses is whether the person feels he has a problem; if so, he at least has some control since he knows he is flawed, and may be more vigilant in seeking assistance. Appellant does not believe he has a problem, and never started the process of controlling his behavior, so he will be "blindsided" by rage and sexual stimulation. Even after appellant has received treatment for his problems, he still does not believe that he has a problem. Without this basic insight, appellant has the utter lack of control required by Pearson.
The experts noted that while in prison, appellant could use litigation as an outlet for his anger and aggressivity. However, he would not be able to transfer that process to the outside world, and would act out aggressively. The experts also addressed appellant's history of violent behavior, including the factors of recency, severity and frequency. Respondent submitted into evidence and presented testimony on the psychopathic personality screening tool completed by the Department of Corrections, which included a *376 number of the factors referenced in Linehan, 518 N.W.2d at 614. Dr. Malecha addressed the literature on prediction of dangerousness and evaluated a number of Linehan factors. The experts at the initial hearing extensively addressed the relevant factors, and the trial court's determination that appellant exhibited an utter lack of control is not clearly erroneous.
After a review hearing, the trial court committed appellant as a psychopathic personality for an indeterminate period. The trial court may consider findings of fact made following the initial commitment, as well as other competent evidence. Minn.R.Civ.Commitment 12.06.
Appellant challenges his indeterminate commitment. He argues that there has been no change in circumstances and that the security hospital merely "warehoused" him without evaluation and treatment. He faults the fact that the only witnesses at the review hearing were Dr. Gilbertson, the court-appointed examiner, and Dr. Farnsworth, the medical director of the Minnesota Security Hospital. Pursuant to agreement by the parties, a written report by Dr. Satterfield was submitted as evidence. Minn.Stat. § 253B.08, subd. 4. Appellant argues that the inexact application of Pearson and Linehan and prediction of future behavior was not sufficient to provide clear and convincing evidence that he is a psychopathic personality and mentally ill.
The court found utter uncontrollability of sexual impulses. In predicting serious danger to the public, the court considered the Linehan factors, with the assistance of expert testimony. The testimony addressed whether appellant met the standards set out in Pearson, Blodgett and Linehan. Unlike the patient in Linehan, 518 N.W.2d at 613, appellant is untreated, and there was extensive testimony as to his lack of control and future dangerousness. Based upon this testimony, the trial court had clear and convincing evidence to commit appellant as a psychopathic personality for an indeterminate period.
5. Appellant argues that the application of the psychopathic personality statute violates his due process rights, and double jeopardy and ex post facto protections.
Respondent first argues that appellant is barred from challenging the constitutionality of the statute due to his failure to notify the attorney general. See Minn.R.Civ.App.P. 144; Swelbar, 473 N.W.2d at 79. In any event, this court and the supreme court have rejected similar challenges to the statute. In re Blodgett, 490 N.W.2d 638, 646-47 (Minn. App.1992), aff'd, 510 N.W.2d 910 (Minn.), cert. denied, ___ U.S. ____, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994). Appellant's arguments have no merit. Finally, we have considered and rejected appellant's pro se arguments.

DECISION
The initial and final judgments of the trial court, resulting in commitment of appellant to the Minnesota Security Hospital for an indeterminate period as mentally ill and dangerous and as a psychopathic personality, are affirmed.
Affirmed.
NOTES
[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn.Const. art. VI, § 10.
[1] Minn.Stat. §§ 526.09-.10 were repealed and recodified as amended in chapter 253B. 1994 Minn.Laws 1st Spec.Sess. ch. 1, art. 1, §§ 1-6. These laws were effective September 1, 1994, after the date of the indeterminate commitment order. See id., § 7.